UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
v.                             )         No. 3:13-CR-61
                               )
BRUCE OWEN DOWNSBROUGH,        )         (VARLAN / SHIRLEY)
                               )
                Defendant.     )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28

U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District

Court as may be appropriate. This case came before the Court on July 16, 2013, for a pretrial

conference and motion hearing on the Defendant's motions to suppress his statements [Doc. 14] and

evidence [Doc. 16] seized in the execution of a search warrant for his home. Assistant United States

Attorney Matthew T. Morris appeared on behalf of the Government. Attorney A. Philip Lomonaco

represented the Defendant, who was also present. The Government presented the testimony of two

witnesses, and the parties provided argument on the issues. At the conclusion of the hearing, the

Court took the motions under advisement. For the reasons contained herein, the undersigned

respectfully recommends that the Defendant's motions to suppress his statements and the evidence

seized in a search of his office be denied.

## I. POSITIONS OF THE PARTIES

This case arises out of the investigation of an international movie production company that operated a website providing DVDs and streaming videos for sale.[1]   Federal agents viewed the company's website and conducted six controlled purchases of DVDs from the company using the website.  In May 2011, federal law enforcement executed a search warrant at the company and seized numerous DVDs, photographs, and business records, including records documenting customer orders.   A review of the company's database revealed that the Defendant Bruce Downsbrough of Knoxville, Tennessee, had made multiple purchases from the company.   On November 16, 2012, law enforcement executed a search warrant at the Defendant's Knoxville residence and seized evidence, including DVDs.  Later that morning, two officers interviewed the Defendant at his office.  The information provided in that interview is "the statement" that is the subject of the Defendant's motion.  On May 21, 2013, the Defendant was charged [Doc. 3] with three counts of receiving child pornography that had been transported in interstate commerce, allegedly occurring on December 4, 2008 (Count 1), February 8, 2009 (Count 2), and in April 2012 (Count 3) and with one count of possession of child pornography on November 16, 2012 (Count 4).

The Defendant seeks to suppress [Doc. 16] the evidence seized in the November 16, 2012 search of his home pursuant to a search warrant.  He argues that the issuing United States Magistrate Judge did not have probable cause to issue the search warrant because he did not personally review the videos alleged by the affiant to be child pornography.  The Defendant also contends that the descriptions of the videos provided by the affiant do not reveal that they contained

---

[1]Background information on the investigation of the international company is taken from the affidavit of United States Postal Inspector John Wallace Bowden, which affidavit Inspector Bowden provided in support of a search warrant for the Defendant's residence. [Doc. 17, Exh. 1] Although probable cause for the issuance of the search warrant is at issue in this case, the parties also recount this background information in their briefs [Docs. 17 and 21].

child pornography. The Defendant also argues [Doc. 14] that his November 16, 2012 statement must be suppressed because officers subjected him to custodial interrogation at his place of employment but did not provide the <u>Miranda</u> warnings.

The Government responds [Docs. 20, 21, and 22] that the affiant's descriptions of the DVDs ordered by the Defendant provided probable cause for the issuance of the search warrant. Alternatively, it contends that the executing officers acted in good faith reliance on the search warrant and, thus, the evidence seized from the Defendant's apartment should not be suppressed even if the supporting affidavit failed to establish probable cause. The Government also contends that the interview of the Defendant at his place of employment was not custodial interrogation.

## II.  SUMMARY OF TESTIMONY

At the July 16 hearing, the Government presented the testimony of two witnesses: Alexandra Lopez, who worked as the Defendant's administrative assistant in November 2012, and Knoxville Police Department (KPD) Investigator Tom Evans.

Alexandra Lopez testified that she is the Executive Assistant to the Interim Executive Vice President of the U.T. Foundation. She stated that in November 2012, the Defendant held the position of Interim Vice President. Ms. Lopez said that as Executive Assistant she performed secretarial duties and scheduled meetings for the Defendant. With the aid of four photographs [Exh. 1-4], Ms. Lopez testified about the layout of the office suite in which she and the Defendant worked. She stated that her desk, which is depicted in Exhibit 1, is in the reception area of the office suite and that the door to the Defendant's office was across the room from her desk. She identified the Defendant's desk, which Exhibit 2 shows is on the left side of his office, and the Defendant's

conference table, which Exhibit 3 shows is on the right side of his office.  She also identified the Defendant's conference table in Exhibit 4, which shows the Defendant's office lengthwise, with the door to the reception area on the left.

Ms. Lopez stated that on November 16, 2012, two men came to the door of the reception area.  She thought that they were maintenance personnel based upon their casual dress but then noticed that one wore a U.S. Postal Service lanyard.  The man wearing the lanyard entered the reception area and introduced himself as a postal inspector.  Ms. Lopez testified that her husband is a postal carrier and that she was concerned the men were there to give her news that something had happened to her husband.  The postal inspector asked if the Defendant was there.  Ms. Lopez said that the Defendant was present and then went to the door to the Defendant's office and told him that two men were there to see him.  The Defendant told her to let them in.  The Defendant closed the door to his office.  After about one-half hour, the men left.  The Defendant escorted them to the door of the suite.  Ms. Lopez testified that after the men left, the Defendant said, "I can't believe how stupid people can be."  Ms. Lopez asked what happened, but the Defendant declined to tell her and went to get coffee.  Ms. Lopez stated that she could not hear what was said while the men were in the Defendant's office with the door closed.

Ms. Lopez testified that the Defendant had only closed the door to his office a handful of times.  She stated that she did not notice if the men were armed.  She stated that they were not wearing police uniforms but, instead, wore slacks and jackets.  She stated that the remainder of that day seemed ordinary and that the Defendant did not leave early, although he left for a time saying that he would be back in one hour.

On cross-examination, Ms. Lopez stated that she remained seated when the men

4

entered the reception area and that her desk blocked her view of their lower bodies. She said that once they were directly in front of her desk, she would have seen if they were armed. She stated that she felt alarmed because she feared something had happened to her husband and that she did not stop feeling alarmed until the men left. She stated that the men waited by her desk while she announced them to the Defendant. She said that as she returned from the doorway to the Defendant's office, she told the men they could go in. The men entered the Defendant's office, and as Ms. Lopez returned to her desk, she saw the Defendant close his office door. She said the Defendant seemed angry after the men left, but he would not tell her why he was angry.

Investigator Tom Evans testified that he has worked for the KPD for seventeen years, and during the last thirteen years, he has investigated internet crimes against children. On November 16, 2012, Investigator Evans assisted with the execution of a search warrant at the Defendant's apartment. The Defendant was not home at the time his apartment was searched. Following the search and around 11:00 a.m. that day, Investigator Evans and Postal Inspector Bowden went to the Defendant's office to attempt to interview him. Investigator Evans testified that they were dressed in pants and coats. Although they were both armed, their firearms were holstered on their waistbands. He said that Inspector Bowden identified himself to the receptionist Ms. Lopez and asked if the Defendant was in. Ms. Lopez announced their presence to the Defendant. As Ms. Lopez returned to her desk, Investigator Evans and Inspector Bowden entered the Defendant's office. Investigator Evans said that Inspector Bowden identified them to the Defendant and told him that they would like to speak to him about an investigation. Inspector Bowden told the Defendant that they had executed a search warrant at his home that morning and had seized DVDs and his computer. Investigator Evans stated that Inspector Bowden asked the Defendant if he would agree

to speak with them.

Investigator Evans stated that the Defendant crossed the room and took a seat at the conference table. Inspector Bowden sat down directly across the table from the Defendant. Investigator Evans said that he asked the Defendant if he could close the door to give them some privacy, and the Defendant agreed. Investigator Evans closed the door to the Defendant's office and then seated himself at the end of the conference table farthest from the door. Testifying from a photograph [Exh. 4] of the Defendant's office, Investigator Evans stated that the Defendant sat on his right, and Inspector Bowden sat on his left. Investigator Evans said that they did not advise the Defendant of the Miranda warnings.

Investigator Evans stated that although the Defendant may have seen their firearms as they were sitting down, they never removed their firearms from their holsters during the interview. He said that while they were seated, their guns were covered by their coats. Inspector Bowden told the Defendant that he was not under arrest but that they would like to talk to him to get his side of the story. Investigator Evans testified that the Defendant, whom Evans noted is a lawyer, said that he would talk to them. They advised the Defendant that they had executed the search warrant at his residence because of his purchase and receipt of child pornography. They asked the Defendant about whether he had committed any contact offenses. Investigator Evans said the Defendant acknowledged that he had purchased movies through the mail from the company they mentioned. Investigator Evans testified that the Defendant also told them that he was investigated in Colorado for a previous contact offense and had one or two contact offenses before that when he was around eighteen years old.

Investigator Evans testified that he and Inspector Bowden spoke with the Defendant

about his schedule, and the Defendant told them that he planned to go out of town for Thanksgiving. Investigator Evans said the Defendant asked about getting his computer back so that he could work remotely, and the officers advised him to make other arrangements. The Defendant then asked them in what condition would he find his home. Investigator Evans said they told the Defendant that his apartment was fine and that he would find it to be neat, as it was when they got there.

Investigator Evans stated that at the end of the interview, Inspector Bowden asked the Defendant if he planned to do anything to hurt himself. Investigator Evans said that although it was a "low key" interview, he could not get a good read on the Defendant's emotional state. Investigator Evans stated that the Defendant told them he was fine and that he had a support system. The interview lasted one hour. During the interview, the blinds were open and Investigator Evans could see people walking past the window. The Defendant was not frisked, nor did the officers conduct a protective sweep of the Defendant's office. Investigator Evans described their conversation with the Defendant as "low key" and said that he and Inspector Bowden tried to be respectful of the difficult nature of the subject matter.

On cross-examination, Investigator Evans testified that he became aware of this case a few months before the search of the Defendant's apartment. He stated that he had not viewed the videos described in the search warrant affidavit. Investigator Evans stated that he closed the door to the Defendant's office at the start of the interview. When they sat down with the Defendant at the conference table, Inspector Bowden repeated who they were, telling the Defendant that Evans was with the KPD. Inspector Bowden told the Defendant that they were conducting an investigation that involved him and that they wanted to talk to him. Investigator Evans said that the Defendant consented to talk with them. Investigator Evans identified his handwritten notes [Exh. 5] from the

7

interview. He stated that he took the notes while they talked with the Defendant and that he tried to write down everything pertinent. The notes state that officers entered the Defendant's home at 8:40 a.m. Below that, Investigator Evans drew a line to indicate where the notes from the interview began. The notes of Investigator Evans reflect that the interview began at 10:58 a.m. Investigator Evans expressly noted that the Defendant was advised that he was not under arrest. Investigator Evans did not recall telling the Defendant that he was free to leave. The notes also state that the Defendant was "very calm" when advised of the search warrant.

Investigator Evans stated that they did not restrict the Defendant's movement during the interview and that at one point, the Defendant got up from the conference table and went to his desk. The Defendant retrieved his cellular telephone, returned to the conference table, and sat down. Inspector Bowden had asked to look at the Defendant's telephone, and the Defendant consented to them looking at it. Investigator Evans said they did not give the Miranda warnings because the Defendant was not under arrest, and they did not plan to arrest him. He stated that the interview of the Defendant was not recorded. Investigator Evans believed that Inspector Bowden asked the Defendant questions about whether he intended to hurt himself because the Defendant's emotions during the questioning were hard to read. Investigator Evans said that although the Defendant said he was "shocked" that they were there about his interactions with the internet company, he did not display shock.

On redirect examination, Investigator Evans testified that in light of the information from the Defendant regarding previous contact offenses, Inspector Bolton asked the Defendant if he had taken any photographs with his phone. Investigator Evans stated that during the interview, the Defendant provided incriminating information such as that he had committed prior contact

8

offenses. Investigator Evans said the Defendant gave them his email addresses and passwords to his email accounts. He testified that the Defendant mentioned a website, which Evans knew from investigating other cases provided images of young boys. On recross-examination, Investigator Evans stated that the Defendant had mentioned the website when asked what other things the officers would find on his computer. Investigator Evans said that he and Inspector Bowden went to the Defendant's office for two reasons: to get the Defendant's side of the story and to try to identify child victims.

### III. FINDINGS OF FACT

Based upon the testimony of the witnesses and exhibits presented at the motion hearing, the Court makes the following factual findings:

On the morning of November 16, 2013, KPD Investigator Tom Evans and Postal Inspector John Wallace Bowden searched the Defendant's Knoxville, Tennessee apartment pursuant to a search warrant and seized DVDs and a computer. Around 11:00 a.m. and following the search, the officers went to the University of Tennessee Foundation, the Defendant's place of employment, to talk to him about the items seized from his apartment. Upon arriving at the Defendant's office suite, the officers entered the reception area. Inspector Bowden identified himself to the Defendant's assistant Alexandra Lopez and asked if the Defendant was in. Ms. Lopez told them that the Defendant was there. Inspector Bowden and Investigator Evans waited by Ms. Lopez's desk while she crossed the room to the open door of the Defendant's office and told the Defendant that two men were there to see him. The Defendant told Ms. Lopez to let them in. As she returned to her desk, Ms. Lopez told the officers that they could go into the Defendant's office.

The officers, who were dressed in casual clothing, entered the Defendant's office. Inspector Bowden told the Defendant who they were and that they would like to speak to him about an investigation. Inspector Bowden informed the Defendant that they had searched his apartment that morning pursuant to a search warrant and had seized DVDs and a computer. Inspector Bowden asked the Defendant if he would speak with them. The Defendant crossed from his desk to a conference table and took a seat across the room from the door. Inspector Bowden sat across the table from the Defendant. Investigator Evans asked the Defendant if he could close the door to the office for privacy, and the Defendant agreed. Investigator Evans closed the Defendant's office door and then sat down at the far end of the conference table, away from the door. The Defendant's path around the end of the conference table and to the door was not blocked by the officers.

Inspector Bowden told the Defendant that he was not under arrest and that they would like to get the Defendant's side of the story. The Defendant, who has a law degree, agreed to talk to the officers. Inspector Bowden told the Defendant that they had searched his apartment for child pornography. The Defendant acknowledged that he had purchased movies through the mail from the company mentioned by the officers. The Defendant also told the officers that he was previously investigated in Colorado for a contact offense involving minor boys and that he had one or two other contact offenses at age eighteen. Inspector Bowden asked the Defendant if he kept pictures of boys on his cellular telephone. The Defendant agreed to let Inspector Bowden look at the images on his telephone. The Defendant got up from the conference table, crossed the room to his desk, and returned to the table with his telephone. At one point, the Defendant stated that he was "shocked" that the officers were talking with him about their investigation. The officers spoke with the Defendant about his schedule and the Defendant told them he planned to go out of town for

10

Thanksgiving. The Defendant inquired about getting his computer back so that he could work remotely while he was away. The Defendant asked the officers about the condition of his apartment after the search. The officers told him that it was neat and in the same condition as when they arrived for the search.

At the end of the interview, Inspector Bowden asked the Defendant whether he intended to hurt himself. The Defendant said that he did not and that he had a support system in place that he could draw upon. The Defendant seemed calm and unemotional throughout the interview, which lasted about one hour. During the interview, the blinds remained open, and the Defendant and the officers could see people walking around outside. The Defendant escorted the officers to the door of the suite when they left. The Defendant was not arrested until after he was indicted over six months later.

## IV. ANALYSIS

The Defendant asks the Court to suppress the evidence seized from his residence pursuant to a search warrant and the statement he gave to officers on November 16, 2012. The Defendant argues that the search warrant for his apartment was invalid because the issuing judge lacked probable cause to believe that child pornography would be found there. He also contends that his statement violates his Fifth Amendment right not to incriminate himself because the officers failed to advise him of the Miranda warnings. The Court will examine each of these issues in turn.

### A. Validity of Search Warrant

11

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. In this respect, a judge shall not issue a warrant for the search of a person, home, or personal property except upon a finding of "probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In the instant case, a United States Magistrate Judge issued a search warrant for the search of the Defendant's apartment for evidence of the possession and receipt of child pornography. The supporting affidavit of United States Postal Inspector John Wallace Bowden relates descriptions of six DVDs purchased by the Defendant from an international company under investigation for selling child pornography. [Doc. 17, Exh. 1] The Defendant contends that the judge did not have probable cause to issue the search warrant because (1) the judge did not view the DVDs listed in the supporting affidavit to determine whether they contained child pornography and (2) the descriptions of the videos in the search warrant affidavit were insufficient for the judge to find probable cause to believe they contained child pornography.

As set out above, the Fourth Amendment requires probable cause for the issuance of a search warrant. Probable cause to search is "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). To make such a showing "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. at 244 n.13. Thus, the Supreme Court has observed that

> probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," Carroll v. United States, 267 U.S. 132, 162, . . . (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. Brinegar v. United States, 338 U.S.

12

160, 176, . . . (1949).

Texas v. Brown, 460 U.S. 730, 742 (1983). In other words, probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances. Gates, 462 U.S. at 238.

The issuing judge's determination that probable cause exists is entitled to "'great deference.'" United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (quoting Gates, 462 U.S. at 236). This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches. Id. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. The "duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Id. at 238-39. In making this determination, the Court considers only the information that was before the issuing judge–in other words, only what is contained within the four corners of the supporting affidavit. United States v. Hatcher, 473 F.2d 321, 323 (6th Cir. 1973); see also Whiteley v. Warden, 401 U.S. 560, 565 (1971).

In the instant case, the affidavit of Inspector Bowden states that he seeks a search warrant to search the Defendant's apartment for evidence of the possession of child pornography. The affidavit provides the following statutory definition of child pornography: "any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where the production of such

13

visual depiction involves the use of a minor engaging in sexually explicit conduct and which is of such conduct." [Doc. 17, Exh. 1, ¶9]; see 18 U.S.C. § 2256(8)(A). "Sexually explicit conduct" is, in turn, defined as "'actual or simulated–(i)sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person.'" [Doc. 17, Exh. 1, ¶7 (quoting 18 U.S.C. § 2256(2)(A)]. The affidavit briefly describes the investigation of an international company for the sale of child pornography over the internet. [Doc. 17, Exh. 1, ¶22-27] The affidavit states that a review of the international company's customer records revealed that the Defendant had purchased sixty-three (63) videos and images from the international company for a total of $2,632.53 in United States currency. [Doc. 17, Exh. 1, ¶28] Attachment B lists the names of the DVDs and photographs ordered by the Defendant. [Doc. 17, Exh. 1, pp.29-30, ¶1] Inspector Bowden states upon his review of the order information and the videos purchased by the Defendant, he believes probable cause exists that the Defendant purchased child pornography. [Doc. 17, Exh. 1, ¶30] Inspector Bowden then describes five videos purchased by the Defendant, entitled Raw Rewind Vol. 3, Raw Rewind Vol. 2, Raw Rewind, Paul & Calin's Home, and Black Sea. [Doc. 17, Exh. 1, ¶¶31-35] Inspector Bowden states that individuals who receive child pornography keep their copies of same in their home and usually retain their child pornography for many years. [Doc. 17, Exh. 1, ¶44(c)]

Congress did not define the term "lascivious" with regard to child pornography. United States v. Brown, 579 F.3d 672, 680 (6th Cir. 2009). The Sixth Circuit applies "a six factor test for 'lasciviousness,' as set forth in United States v. Dost, 636 F. Supp. 828, 832 (S.D. Cal. 1986)." Id. The Dost factors are

14

"1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;

2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;

3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

4) whether the child is fully or partially clothed, or nude;

5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer."

Id. (quoting Dost, 636 F. Supp. at 832). These factors are not the only ones that may be considered and an image does not have to meet all six factors in order to be deemed lascivious. Id.

The Defendant contends that the issuing Magistrate Judge did not have probable cause to issue the search warrant for his apartment because he did not view the alleged child pornography himself but, instead, relied upon the descriptions of five DVDs provided by Inspector Bowden. The Defendant argues that the only way that the five DVDs described in the affidavit meet the definition of "sexually explicit conduct" is if they depict "lascivious exhibition of the genitals or pubic area." Relying on United States v. Brunette, 256 F.3d 14, 18 (1st Cir. 2001), the Defendant argues that because the determination of whether an image or video involves the "lascivious exhibition of the genitals or pubic area" requires a subjective determination by the viewer, it is error for a judge to issue a search warrant without viewing the alleged child pornography him- or herself.

Like the Sixth Circuit, the First Circuit has adopted the six-factor inquiry originating in Dost. Brunette, 256 F.3d at 18. In Brunette, the affiant gave only a conclusory statement that the

images in question "depicted 'a prepubescent boy lasciviously displaying his genitals'" and provided no details regarding the images. <u>Id.</u> at 17. The First Circuit stated "probable cause to issue a warrant must be assessed by a judicial officer, not an investigating agent." <u>Id.</u> at 18. The court held that because the determination of whether an image constitutes child pornography is a subjective one, "the determination should be made by a judge, not an agent." <u>Id.</u> The court concluded that

> there having been no basis for issuing the warrant other than conclusory statutory language, the magistrate judge should have viewed the images and the district court should not have excused his failure to do so. It was error to issue the warrant absent an independent review of the images, or at least some assessment based on a reasonably specific description. Ordinarily, a magistrate judge must view an image in order to determine whether it depicts the lascivious exhibition of a child's genitals.

<u>Id.</u> at 19. Another reason for requiring the issuing judge to view the image is to permit him or her to determine whether the image depicts an actual child: "The best practice is for an applicant seeking a warrant based on images of alleged child pornography to append the images or provide a sufficiently specific description of the images to enable the magistrate judge to determine independently whether they probably depict real children." <u>United States v. Syphers</u>, 426 F.3d 461, 467 (1st Cir. 2005). Nevertheless, the Court observes that in both <u>Brunette</u> and <u>Syphers</u>, the First Circuit acknowledged that a detailed description of the alleged child pornography, while not necessarily the "best practice," could provide the basis for the magistrate judge's probable cause assessment. <u>Id.</u> at 467; <u>Brunette</u>, 256 F.3d at 19.

Other circuits examining the issue have not required the issuing judge to view the alleged child pornography in order to determine probable cause. <u>United States v. Pavulak</u>, 700 F.3d 651, 660 (3rd Cir. 2012) (determining that the issuing judge must "independently evaluate" whether the image is child pornography in one of three ways: "(1) the magistrate can personally view the

images; (2) the search-warrant affidavit can provide a 'sufficiently detailed description' of the images; or (3) the search-warrant application can provide some other facts that tie the images' contents to child pornography"); United States v. Gatherum, 338 F. App'x 271, 276-77 (4th Cir.) (holding "we reject any suggestion that a search-warrant affidavit must include copies of images giving rise to the request for a warrant"), cert. denied 558 U.S.1083 (2009); United States v. Lowe, 516 F.3d 580, 586 (7th Cir. 2008) (observing that "[a]s a general matter, an issuing court does not need to look at the images described in an affidavit in order to determine whether there is probable cause to believe that they constitute child pornography"); United States v. Battershell, 457 F.3d 1048, 1053 (9th Cir. 2006) (holding that while the inclusion of the photographs depicting child pornography in the warrant application is "preferable, . . . a judge may properly issue a warrant based on factual descriptions of an image"); see also United States v. Brewer, 588 F.3d 1165, 1170-71 (8th Cir. 2009) (affirming issuance of search warrant based upon victim's description of the photos taken by the defendant of her when she was a minor). Cf. New York v. P.J. Video, Inc., 475 U.S. 868, 874 n.5 (1986) (noting that "we have never held that a magistrate must personally view allegedly obscene films prior to issuing a warrant authorizing their seizure. On the contrary, we think that a reasonably specific affidavit describing the content of a film generally provides an adequate basis for the magistrate to determine whether there is probable cause to believe that the film is obscene"). Accordingly, the Court finds that the magistrate judge making the probable cause determination in this case did not have to view the DVDs alleged to be child pornography.

This finding does not end the inquiry, however. What the above cited decisions from our sister circuits have in common is that the affiant's description of the alleged pornographic image must be sufficiently detailed to allow the issuing judge to make an independent determination of

whether the image is child pornography, rather than relying solely on the affiant's conclusory statement that it is. Pavulak, 700 F.3d at 661; Lowe, 516 F.3d at 586 (observing that a "detailed verbal description [by the affiant] is sufficient"); Battershell, 457 F.3d at 1052; Brunette, 276 F.3d at 19. C.f., Gatherum, 338 F. App'x 276-77 (declining to decide whether the affiant's description was sufficient but observing that an affiant may properly make factual conclusions in an affidavit). In the instant case, the Defendant argues that even if the magistrate judge did not have to view the DVDs himself, he still erroneously concluded that the affidavit provided probable cause to issue the search warrant. The Defendant contends that Inspector Bowden's descriptions of the DVDs did not show that the DVDs depicted the lascivious exhibition of genitals or pubic area. Instead, the Defendant maintains that the sole Dost factor met by Inspector Bowden's descriptions is that the DVDs show children who are nude. He argues that depictions of nudity alone are "protected expression," and insufficient to support a finding of probable cause that child pornography would be found in his apartment. See Osborne v. Ohio, 495 U.S. 103, 113 (1990) (stating that "depictions of nudity, without more, constitute protected expression").

First, the Court observes that the descriptions of the DVDs in Inspector Bowden's twenty-four page affidavit [Doc. 17, Exh. 1], span three and one-half pages of single-spaced type. These descriptions are a far cry from the affiant's conclusory statement that an image is child pornography found to be insufficient in other cases. See Pavulak, 700 F.3d at 661 (concluding that "[p]resented with just the label 'child pornography,' the most the magistrate could infer was that the *affiant* concluded that the images constitute child pornography"); Gatherum, 338 F. App'x at 276 (observing that affiant stated that both he and another officer determined the images show a minor engaged in sexually explicit conduct); Battershell, 457 F.3d at 1051 (concluding that affiant's "terse

description" of an eight-to-ten-year-old girl naked in a bathtub was insufficient); Brunette, 256 F.3d at 17 (examining the affiant's "bare legal assertion" that "the images depicted 'a prepubescent boy lasciviously displaying his genitals'").  Inspector Bowden provided descriptions of five DVDs ordered by the Defendant from the international company: Raw Rewind Vol. 3 ("RR3") [Doc. 17, Exh.1, ¶31], Raw Rewind Vol. 2 ("RR2") [Doc. 17, Exh.1, ¶32]; Raw Rewind ("RR") [Doc. 17, Exh.1, ¶33]; Paul & Calin's Home ("P&CH") [Doc. 17, Exh.1, ¶34], and Black Sea ("BS") [Doc. 17, Exh.1, ¶35].  The Court examines the descriptions contained in Inspector Bowden's affidavit in light of the Dost factors to determine whether they provide a substantial basis for the issuing magistrate judge to conclude that the DVDs contain "lascivious exhibition of the genitals or pubic area of any person." See 18 U.S.C. § 2256(2)(A)(v) (defining "sexually explicit conduct").

The first Dost factor examines whether the focal point of the image is on the child's genitals or pubic area.  Brown, 579 F.3d at 680.  According to Inspector Bowden's affidavit, the RR3 DVD shows three naked boys, under age eighteen, "gather around some food and begin eating and the camera is arranged to hover over the boys showing their genitals." [Doc. 17, Exh.1, ¶31] With regard to P&CH, Inspector Bowden states that two minor boys under age eighteen disrobe and sit across from each other.  [Doc. 17, Exh.1, ¶35] The boys wrestle, then sit across from each other and slap their hands together.  [Doc. 17, Exh.1, ¶35]  "A close up video shot is seen of the boy's mouth and tongues [sic.].  The boys lie in such a way that their genitals and anus are the focus of the camera."  [Doc. 17, Exh.1, ¶35] In BS, two minor boys under age eighteen are shown wrestling "on mattresses while they are naked and their genitals and anus are featured in the video."  [Doc. 17, Exh.1, ¶36] Also in BS, two minor boys are shown sitting side by side with "their genitals exposed and the camera focuses on their genitals."  [Doc. 17, Exh.1, ¶35] Although the Defendant argues that

it is hard to determine the focal point of the videos without reviewing them, the Court finds that the above descriptions of three of the DVDs show that the camera focused on the child's genitals.

The second Dost factor assesses whether the setting of the depiction is "'sexually suggestive, i.e., in a place or a pose generally associated with sexual activity.'" Brown, 579 F.3d at 680. In the fourth DVD (P&CH), minor boys are shown wrestling on a bed while naked. [Doc. 17, Exh.1, ¶34] The fifth DVD ( BS) depicts three nude minor boys having a pillow fight on a bed. [Doc. 17, Exh.1, ¶35] The boys then lie down one at a time and receive massages from each other. [Doc. 17, Exh.1, ¶35] The Court finds that the setting (a bed) and the poses (wrestling and massaging) in these video segments are sexually suggestive. United States v. Daniels, 653 F.3d 399, 407-08 (6th Cir. 2011) (applying the Dost factors and finding that a bed is a sexually suggestive setting), cert. denied 132 S. Ct. 1069 (2012).

The third Dost factor examines whether the child is posed unnaturally or in inappropriate attire given the child's age. Brown, 579 F.3d at 680. The Defendant contends that whether the children in the DVDs are ever in an unnatural pose cannot be determined from the descriptions. The Government argues that although the boys in the five DVDs are shown doing "everyday" activities (eating, swimming, showering, dancing, wrestling, etc.), the fact that the boys do these activities together and naked is unnatural, inappropriate, and suggests that the producer of the depiction coached the boys to do these things in order to create a sexually suggestive video. The Court agrees with the Government. Inspector Bowden's descriptions reveal that the minor boys in at least four of the DVDs are not infants or toddlers because they are shown walking out onto the street (RR3 [Doc. 17, Exh.1, ¶31], RR2 [Doc. 17, Exh.1, ¶32], RR [Doc. 17, Exh. 1, ¶33], and P&CH [Doc. 17, Exh. 1, ¶34]) and going to a pool together from other venues (RR3 [Doc. 17, Exh.1,

¶31], RR2 [Doc. 17, Exh.1, ¶32], and RR [Doc. 17, Exh. 1, ¶33] ).  The magistrate judge reviewing these descriptions reasonably determined that the images of the boys shown nude in a variety of everyday activities was inappropriate and sexually suggestive given the boys' ages.

The fourth Dost factor looks to whether the child is shown clothed or nude.  Brown, 579 F.3d at 680.  The Defendant concedes that all five DVDs depict nude minor boys.  Inspector Bowden's descriptions of the DVDs reveal that the minor boys were nude during most of the length of the films.  Although the nudity of a child alone does not make the depiction child pornography, the Court finds that the extensive nudity in the DVDs described in Inspector Bowden's affidavit, combined with the focal points, settings, and poses, suggests that the purpose of these DVDs is to be sexually stimulating to pedophiles.  See id. at 681 (holding that "all the images presented by the government depict the girls nude, which satisfies the fourth Dost factor").

The fifth Dost factor concerns "'whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity[.]'"  Brown, 579 F.3d at 680.  In Dost, the court reasoned that although young children are likely incapable of sexual coyness, the way in which a child is posed in the image, such as the child staring directly at the camera with his or her head slightly tilted to the side while the child is fully nude, can suggest "a sexually coy attitude" or willingness to engage in sexual activity.  636 F. Supp. at 832.  In two of the instant DVDs (RR2 and P&CH), naked young boys are shown touching their own genitals while in the company of other naked boys.  [Doc. 17, Exh. 1, ¶¶32 & 34]  Two additional DVDs (RR and BS) depict naked young boys massaging each other.  [Doc. 17, Exh. 1, ¶¶33 & 35] The judge reviewing the search warrant affidavit properly determined that these poses suggest sexual coyness.  Additionally, the P&CH DVD closes with a close- up of the boys mouths and tongues and then shifts to focus on the genitals

and anuses of the two prone naked boys. [Doc. 17, Exh. 1, ¶34] The Court finds that the immediate juxtaposition of these two poses suggests that the boys are willing to engage in sexual activity.

The final <u>Dost</u> factor examines "'whether the visual depiction is intended or designed to elicit a sexual response in the viewer.'" <u>Brown</u>, 579 F.3d at 680. In expounding on this factor, the <u>Dost</u> court observed that this is not the "'average viewer,'" but "the pedophile viewer." <u>Dost</u>, 636 F. Supp. at 831. The Court finds that the combination of the sexual suggestiveness of some of the activities on the DVDs (boys wrestling and massaging while naked) and of some of the poses or focal points of the DVDs (naked boys touching their own genitals while in the company of other naked boys and the juxtaposition of close-ups shots of mouths, tongues, and then genitals and anuses) reveal that the DVDs are intended to be sexually stimulating to a pedophile. The names of some of the DVDs ordered by the Defendant from this same company–<u>Slippery Vlaviu Commando Wiggles: Boy Fights XVII</u>, <u>Skinny Dippers</u>, <u>Slim Pfeiffer's Peter and the Desert Riders</u>, <u>Mysterious Skin (Unrated Director's Addition)</u>, <u>Karleken's Sprak</u> (<u>Love Language</u>)[2], and <u>Raw Rewind Volumes 1-3</u>–are sexually suggestive. Accordingly, the Court finds that the sixth <u>Dost</u> factor is also present.

The Court finds that Inspector Bowden's descriptions of the five DVDs that the Defendant ordered from the international company were sufficiently detailed and provided information that would permit a reviewing judge to determine whether the DVDs contained lascivious exhibitions of the genitals of minor boys. Accordingly, the Court finds that the magistrate judge had a substantial basis on which to find probable cause to issue a search warrant for the search of the Defendant's apartment for child pornography. The Defendant's Motion to

_____

[2]The names of the other DVDs that the Defendant is alleged to have ordered from this same company appear in Attachment B to the affidavit, which lists the items to be seized in the search. [Doc. 17, Exh. 1, pp. 29-30]

Suppress the Search of the Defendant's Residence Based on Search Warrant [Doc. 16] should be denied.

Alternatively, the Government argues that even if Inspector Bowden's descriptions of the DVDs did not provide probable cause for the issuance of the search warrant, the officers executed the search warrant in good faith. It contends that the evidence seized from the Defendant's apartment should not be excluded because the executing officers acted in good faith reliance on the search warrant.

"The general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible." United States v. Dice, 200 F.3d 978, 983 (6th Cir. 2000); see also Mapp v. Ohio, 367 U.S. 643, 654 (1961) (holding that "all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court"); Weeks v. United States, 232 U.S. 383, 398-99 (1914) (establishing the exclusionary rule as the remedy for violations of the Fourth Amendment). However, the exclusion of evidence is "a judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" United States v. Herring, 129 S. Ct. 695, 699 (2009) (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)). The exclusionary rule applies only where "its remedial objectives are thought most efficaciously served," Arizona v. Evans, 514 U.S. 1, 11 (1995), and where it "'results in appreciable deterrence.'" Herring, 129 S. Ct. at 700 (quoting United States v. Leon, 468 U.S. 897, 909 (1984)). In the instant case, the Court has found no basis to suppress the evidence seized pursuant to search warrant. However, if the District Judge disagrees that the affidavit provides probable cause for the issuance of the search warrant, the Court finds that the Leon good faith exception should apply to prevent application of the exclusionary rule.

In <u>Leon</u>, the United States Supreme Court held that the exclusionary rule should not bar "admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." <u>Leon</u>, 468 U.S. at 905. The relevant inquiry is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." <u>Id.</u> at 922 n. 23. <u>Leon</u> established four situations in which an officer's reliance on a subsequently invalidated warrant could not be considered to be objectively reasonable: (1) when the search warrant is issued on the basis of an affidavit that the affiant knows, or is reckless in not knowing, contains false information; (2) when the issuing magistrate abandons his neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable, or where the warrant application was supported by nothing more than a "bare bones" affidavit; and (4) when the warrant is so facially deficient that it cannot reasonably be presumed to be valid. <u>See</u> <u>United States v. Washington</u>, 380 F.3d 236, 241 (6th Cir. 2004).

In the instant case, Inspector Bowden and Investigator Evans executed a search warrant supported by Inspector Bowden's twenty-four page affidavit. Although Inspector Bowden knew that the issuing judge did not review the DVDs in question, he also knew that the affidavit included detailed descriptions of five of the DVDs which the international company's records revealed that the Defendant had ordered. The Court finds nothing that should have indicated to the officers that the affidavit was obviously lacking in probable cause or was bare bones. Thus, the Court finds that a reasonably well-trained officer would not have understood search to be illegal. The Court finds that the <u>Leon</u> good faith exception should apply in this case.

## B. Voluntariness of November 16, 2012 Statement

The Defendant argues that his statements to officers made at his office on November 16, 2012, must be suppressed because the officers failed to advise him of the Miranda warnings in violation of the Fifth Amendment. The Defendant contends that the officers' questions constituted custodial interrogation because the officers were uninvited and they were positioned in a coercive and imposing way that prevented him from leaving. The Government responds [Doc. 20] that the Miranda warnings were not necessary because the Defendant was not under arrest but, instead, agreed to be interviewed by the officers at his office. It contends that a reasonable person in the Defendant's circumstances would have felt that he could end the interview at will.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury v. California, 511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948.

The obligation to administer Miranda warnings to suspects only arises if there has been "such a restriction on a person's freedom as to render him 'in custody.'" Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam). To determine whether an individual is in custody for purposes of Miranda, the Court examines the totality of the circumstances to assess how a reasonable person in that situation would have interpreted the situation. Salvo, 133 F.3d at 948; see also United States v. Swanson, 341 F.3d 524, 528 (6th Cir. 2003). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views

harbored by either the interrogating officers or the person being questioned." <u>Stansbury</u>, 511 U.S. at 323; <u>Mason v. Mitchell</u>, 320 F.3d 604, 631 (6th Cir. 2003). The "'ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" <u>United States v. Knox</u>, 839 F.2d 285, 291 (6th Cir. 1988) (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted); <u>Swanson</u>, 341 F.3d at 529.

In determining whether a defendant was in custody, the Court examines the totality of the circumstances to ascertain a reasonable person's understanding of the situation. <u>Salvo</u>, 133 F.3d at 948. Relevant to the inquiry is whether a reasonable individual in the same position as the defendant would have felt free to leave. <u>Swanson</u>, 341 F.3d at 529. Other factors useful in making this determination are:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

<u>Salvo</u>, 133 F.3d at 950; <u>see also</u> <u>Swanson</u>, 341 F.3d at 529.

First, the Court finds that the purpose of the questioning was to gain incriminating evidence or a confession from the Defendant. Investigator Evans testified that he and Inspector Bowden interviewed the Defendant for two reasons, to get the Defendant's side of the story and to identify child victims. The fact that they thought the Defendant could identify victims of child pornography reveals that they sought incriminating evidence against him. The Defendant was clearly a target of their investigation at the time of the interview, and they had just completed a

search of his apartment where they seized DVDs and a computer that they believed contained images of child pornography.

The location of the interview, however, indicates that it was not custodial. The Defendant was interviewed in his private office at his place of employment. The Sixth Circuit has twice analyzed the interview of a defendant at his or her place of employment. In United States v. Crossley, the defendant was interviewed in a large classroom with windows at the military camp where she worked. 224 F.3d 847, 862 (6th Cir. 2000). The appellate court determined that the location, which was "not a confined space which could be intimidating[,]" to be one factor supporting its determination that the interview was noncustodial. Id. Similarly, in United States v. Mahan, our appellate court concluded that an employee questioned at his place of employment was not in custody. 190 F.3d 416, 422 (6th Cir. 1999). Initially, the Court observes that in the present case, the Defendant agreed that the officers could come into his office. The Defendant chose to sit with the officers at his conference table and chose his seat, which had an unblocked path to the door of the office. The Defendant agreed that Investigator Evans could close the door before the interview began. See Salvo, 133 F.3d at 951 (concluding that the officer chose to interview the defendant in his car in order "to save him from a more public exposure of his criminal activity [involving child pornography], not out of a desire to coerce or intimidate him"). The room contained a window. The Court does finds that the location of the interview was neither hostile, nor coercive.

The third relevant factor is the length of the interview. Salvo, 133 F.3d at 950; Swanson, 341 F.3d at 529. Here, the interview lasted one hour. Moreover, Investigator Evans described the tone of the interview as "low-key." The officers were dressed in casual clothing and,

although they were armed, their weapons were covered by their jackets during the interview. The Court concludes that the length and tone of the meeting were not designed to force the Defendant to confess.

Finally, the Court looks to whether the circumstances of the interview reveal "other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions." Salvo, 133 F.3d at 950; see also Swanson, 341 F.3d at 529. The Court finds that although the officers did not expressly tell the Defendant that he was free to leave or to ask them to leave, they did tell him that he was not under arrest. In Salvo, the court found the fact that the officers told the defendant that he was not under arrest to be possibly the "most significant[]" factor in assessing whether the defendant was in police custody. 133 F.3d at 951. Here, the Defendant discussed his travel plans for the coming Thanksgiving holiday and asked the officers in what condition would he find his apartment when he returned there. These statements reveal that the Defendant did not believe that he was being arrested at the conclusion of the interview. The Defendant's movements during the interview were not restrained, and, in fact, he got up and crossed the room to his desk to retrieve his cellular telephone. Finally, the Defendant told his receptionist to let the officers into his office and he expressly agreed to talk with them, after learning that they had searched his home pursuant to a search warrant.

The Defendant argues the fact that the officers asked him if the interrogation was making him suicidal shows that he was under pressure to answer the officers' questions. The Court

finds that the officers asked the Defendant if he had any plans to hurt himself because the Defendant had remained calm and unemotional during the interview, despite being confronted with evidence that he possessed child pornography, and they found him "hard to read." The Defendant allayed any fears that he might be suicidal by denying any suicidal intentions and stating that he had a support system. The Court finds that nothing about the Defendant's demeanor during the interview indicated that he subjectively believed he was in police custody. Moreover, the inquiry for the Court is an objective one. The Court must ask whether a reasonable person in the Defendant's circumstances would believe he was free to decline the interview and to ask the officers to leave.

Based upon the totality of the circumstances, the Court finds that a reasonable person in the Defendant's situation would have felt that he could have ended the interview and asked the officers to leave. Accordingly, the Court finds that the Defendant was not in custody when he was interviewed in his office by Investigator Evans and Inspector Bowden on November 16, 2012, and the Miranda warnings were not required. The Court recommends that the Motion to Suppress Defendant's Statements [Doc. 14] be denied.

## V.  CONCLUSION

After carefully considering the motions, memoranda, testimony, and exhibits and after reviewing the relevant legal authorities, the Court finds that Inspector Bowden's affidavit provided probable cause to issue the search warrant for the Defendant's apartment and that the Defendant statements on November 16, 2012, were not custodial.  For the reasons set forth herein, it is **RECOMMENDED** that the Motion to Suppress Defendant's Statements [**Doc. 14**] and the Motion to Suppress the Search of Defendant's Residence Based on Search Warrant [**Doc. 16**] be **DENIED**.[3]

Respectfully submitted,

___s/ C. Clifford Shirley, Jr.___
United States Magistrate Judge

---

[3]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see  United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).