
BRUCE OWEN DOWNSBROUGH
REG. NO. 46127-074
FCI ENGLEWOOD
FEDERAL CORR. INSTITUTION
9595 WEST QUINCY AVENUE
LITTLETON, CO  80123

December __, 2020

Mr. John L. Medearis
Clerk of Court
U. S. District Court
Eastern District of Tennessee
Knoxville Division
800 Market Street, Suite 130
Knoxville, TN 37902

    RE:   *Downsbrough v. United States*
           Crim No. 3:13-cr-00061-TAV-CCS-1

Dear Mr. Medearis:

    Enclosed please find and accept for filing Movant's Motion for Compassionate Release/Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A), CARES Act, and the First Step Act of 2018. Please submit this document to the Court.

    Thank you for your assistance in this matter.

                        Sincerely,

                        BRUCE OWEN DOWNSBROUGH
                        Appearing *Pro Se*

*Encl. as noted*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| BRUCE OWEN DOWNSBROUGH, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | Crim No. 3:13-cr-00061-TAV-CCS-1 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## MOTION FOR COMPASSIONATE RELEASE/REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A), CARES ACT, AND THE FIRST STEP ACT OF 2018

COMES Movant, BRUCE OWEN DOWNSBROUGH ("Downsbrough"), appearing *pro se,* and respectfully moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to home confinement and a period of supervised release. The unprecedented threat of COVID-19 could not have been foreseen at sentencing, and poses extraordinary risks to Downsbrough's health. The virus thrives in densely packed populations, and the FCI is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Downsbrough. Downsbrough's advanced age makes him especially vulnerable to the deadly risks of COVID-19. Allowing Downsbrough to

1

finish out his sentence at home is the only prudent response to the extraordinary and compelling circumstances created by the novel coronavirus.

# I. <u>JURISDICTION</u>

The district court's jurisdiction to correct or modify a defendant's sentence is limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582. The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is extremely limited. *Dillon v. United States*, 130 S.Ct. 2683, 2687(2010). It is black-letter law that a federal court generally "may not modify a term of imprisonment once it has been imposed." *Id.* However, Congress has allowed an exception to that rule "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

# II. <u>STATEMENT OF THE CASE</u>

## A. <u>Procedural Background</u>

On May 21, 2013, a grand jury in the United States District Court for the Eastern District of Tennessee, Knoxville Division returned a four (4) count

2

Indictment charging Downsbrough. See Doc. 3.[1] Counts 1, 2, and 3 charged Downsbrough with Receiving Child Pornography That Had Been Transported in Interstate and Foreign Commerce, in violation of 18 U.S.C. § 2252A(2)(A). *Id.* Count 4 charged Downsbrough with Possessing a Computer Disk and Material That Contain Images of Child Pornography That Has Been Shipped and Transported in Interstate and Foreign Commerce, in violation of 18 U.S.C. § 2252(a)(5)(B). *Id.* The Indictment also contained Forfeiture Allegations, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 2253(b). *Id.*

On October 30, 2013, a Change of Plea Hearing was held and Downsbrough entered a plea of guilty on Counts 3 and 4 of the Indictment, pursuant to a written Plea Agreement. See Docs. 30, 32.

On May 16, 2014, Downsbrough was sentenced to a total term of 121 months' imprisonment, 10 years Supervised Release, $75,000.00 Fine, $25,000.00 Restitution, and a Mandatory Special Assessment Fee of $200. See Docs. 52, 53.

---

[1]

"Doc." refers to the Docket Report in the United States District Court for the Eastern District of Tennessee, Knoxville Division in Criminal No. 3:13-cr-00061-TAV-CCS-1, which is immediately followed by the Docket Entry Number.

**B. Statement of the Facts**

1. Offense Conduct

The United States and Downsbrough, through the advise of his counsel agreed

to the following facts which satisfy the offense elements:

a) On November 16, 2012, a federal search warrant was executed at the defendant's residence in Knoxville, Tennessee. Pursuant to the search warrant law enforcement personnel seized the defendant's computer from the defendant's residence.

b) On November 16, 2012, the defendant was interviewed and admitted that he searched for pictures of young naked boys on the Internet, some images of which he saved to the hard drive of his computer.

c) A forensic examination of the defendant's computer seized during the execution of the search warrant at the defendant's residence on November 16, 2012, revealed that child pornography was stored on the seized computer and that the child pornography had been downloaded from an Internet website with servers located outside of the United States.

See Doc. 30 at 2-3.

2. Plea Proceeding

On October 30, 2013, a Change of Plea Hearing was held before Chief District

Judge Thomas A. Varlan. See Doc. 32. Downsbrough pled guilty to Counts 3 and 4

of the Indictment, pursuant to a written Plea Agreement. See Doc. 30. In exchange for

Downsbrough's guilty plea, the government agreed to: (1) recommend a 121-month

4

imprisonment; and (2) not to oppose a 2-level reduction for acceptance of responsibility and move the Court for an addition 1-level decrease pursuant to USSG § 3E1.1(b). *Id.* at 5-6. The case was referred to the Probation Office for the preparation of the Presentence Report ("PSR").

### 3. Presentence Report Calculations and Recommendations

On April 17, 2014, the Probation Office prepared Downsbrough's PSR, which was revised on May 8, 2014. See Docs. 39, 46. The PSR recommended a Base Offense Level of 22, pursuant to USSG § 2G2.2(a). Two (2) levels were added because the offense involved a prepubescent minor; Four (4) levels were added because the material portrays sadistic or masochistic conduct or other depictions of violence; Two (2) levels were added because a computer was involved; Five (5) levels were added because the offense involved 600 or more images of child pornography; and Downsbrough received a three (3) level reduction for timely acceptance of responsibility. The PSR calculated Downsbrough's Total Offense Level to be level 32. Downsbrough's total criminal history points placed him in Criminal History Category of I. Based upon a Total Offense Level of 32, in Criminal History Category I, the guideline imprisonment range was 121 to 151 months.

5

4. Sentencing Proceeding

On May 16, 2014, a Sentencing Hearing was held before Chief District Judge Thomas A. Varlan. See Doc. 52. At sentencing, the District Court adopted the PSR as its own and sentenced Downsbrough to a total term of 121 months' imprisonment, followed by 10 years of Supervised Release, and ordered to pay $75,000.00 Fine, $25,000.00 Restitution, and $200.00 Mandatory Special Assessment Fee. See Doc. 53. No direct appeal was filed in this case.

## III. DISCUSSION

As a preliminary matter, Downsbrough respectfully requests that this Court be mindful that *pro se* complaints are to be held "to less stringent standards than formal pleadings drafted by lawyers," and should therefore be liberally construed. *Jamieson v. United States*, 692 F.3d 435 (6th Cir. 2012) (quoting *Martin v. Overton*, 391 F.3d 710, 712 (6th Cir.2004)); *Estelle v. Gamble*, 429 U.S. 97 (1976)(same); and *Haines v. Kerner*, 404 U.S. 519 (1972)(same).

### A. Compassionate Release/Reduction in Sentence Pursuant to 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g)

Congress authorized compassionate release in the Sentencing Reform Act of 1984. It allows federally incarcerated people to appeal for early release if they present certain "extraordinary and compelling" reasons. Upon approval of the request, Bureau

6

of Prisons ("BOP") makes a motion to a federal judge for a sentence reduction. The Commission sets the "extraordinary and compelling" criteria, which include, but are not limited to, age and terminal illness. The program essentially allows BOP to seek the release of certain elderly and terminally ill inmates, as well as those with special family circumstances, before the end of their prison sentences rather than keep those inmates in prison when they are no longer a significant risk to the community and when they are draining away substantial and valuable BOP resources.

Congress gave the Commission the authority to determine the conditions by which an individual in federal prison could be released for "extraordinary and compelling reasons." It authorized federal courts to reduce a defendant's sentence if that individual meets the criteria set by the Commission. And Congress gave BOP the administrative task of filing motions in federal court if the defendant meets the Commission's criteria for compassionate release.

### ***Compassionate Release Under The First Step Act***

The First Step Act ("the Act") made important changes to how federal compassionate release works. It changes and expands the compassionate release eligibility criteria; ensures the prisoners have the right to appeal the BOP's denial or neglect of the  prisoner's request for a compassionate release directly to court; and provides other important features, such as notification, assistance, and visitation rules.

7

### *Compassionate Release Objective Criteria Under the First Step Act*

The criteria for determining whether a prisoner has an "extraordinary and compelling reason" for a sentence reduction are sometimes broader under the Sentencing Guidelines than under the BOP Program Statement. Prisoners seeking compassionate release and/or filing motions should consult USSG § 1B1.13, in addition to the BOP Program Statement 5050.50 for guidance on what reasons are considered by courts to be "extraordinary and compelling."

### *Request Based on Elderly Prisoners*

Downsbrough is an elderly inmate, who fits the following criteria:

- Age 65 and older.
- Has served more than 66.67 percent of his sentence.

Downsbrough, currently housed at the Federal Correctional Institution, Englewood, in Littleton, CO ("FCI Englewood"). Downsbrough is a non-violent offender, hence, his recidivism is especially low. Because of the relatively limited risk of recidivism and the relatively limited potential danger to the community of his release, he was sentenced to 121 months' imprisonment, and his projected release is on December 31, 2021. Since his incarceration in FCI Big Srping, in June 2013, Downsbrough has maintained clear conduct throughout his entire term of incarceration with the BOP. In his 5 ½ years at FCI Big Spring, Downsbrough was

8

a GED tutor (indeed, three (3) of the Valedictorians during those years were his students). Downsbrough was also a suicide companion in the Suicide Prevention Program. Downsbrough has been proactive about getting into the BOP's sex offender treatment program– as soon as Psychology in Big Spring would let him put his name of the waiting list for the program (offered in Englewood). He has talked to Mr. Mills in Psychology about getting into the program, which at this point , Downsbrough is merely waiting for the next session to start. More so, Downsbrough has completed several Education Courses, which will assist his reintegration to the society. Downsbrough also created and taught an adult continuing education course titled Understanding Medicare. See Exhibit 1.

No aspect of Downsbrough's offense involved violence. Since he was incarcerated, Downsbrough had no disciplinary infractions at all. Downsbrough does not have ties to large-scale criminal organizations, gangs, or cartels. Hence, Downsbrough qualifies under the limited circumstances that authorize such a motion, and because of the relatively limited risk of recidivism and the relatively limited potential danger to the community of his release.

i.    **UNDER THE FIRST STEP ACT, THIS COURT HAS BROAD AUTHORITY TO DETERMINE WHETHER EXTRAORDINARY AND COMPELLING CIRCUMSTANCES EXIST TO MODIFY DOWNSBROUGH'S SENTENCE AND RELEASE HIM TO HOME CONFINEMENT.**

9

The First Step Act ("FSA") expressly permits Downsbrough to move this Court to reduce his term of imprisonment and seek compassionate release. See 18 U.S.C. § 3583(c)(1)(A)(i). Under normal circumstances, a defendant can seek recourse through the courts after either (1) the BOP declines to file such a motion on his behalf; or (2) there has been of lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier. *Id.* Downsbrough files this motion now in light of the urgent nature of this matter.

**Note:** On September 15, 2020, Downsbrough filed a Motion for Compassionate Release, which was denied on October 5, 2020. See Exhibit 2.

After exhausting the administrative process, "a court may then 'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Ebbers*, 2020 WL 91399, at *4, 02-CR-1144 (VEC) (S.D.N.Y. Jan. 8, 2020), ECF No. 384. "In making its decision, a court must also consider "the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable."" *Id.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

Because Downsbrough has already filed a Motion for Compassionate Release to the BOP Warden, and was denied, exhaustion of administrative remedies is no longer an issue in this case.

10

**"Extraordinary and Compelling Reasons" Warrant a Reduction in Downsbrough's Sentence.**

1.  COVID-19 Is a Public Health Disaster That Threatens Vulnerable Incarcerated Persons like Downsbrough.

The COVID-19 pandemic continues to roil the United States. As November 4, 2020, the BOP has 125,463 federal inmates in BOP-managed institutions and 14,155 in community-based facilities. The BOP staff complement is approximately 36,000. There are 1,940 federal inmates and 870 BOP staff who have confirmed positive test results for COVID-19 nationwide. There have been 130 federal inmate deaths and 2 BOP staff member deaths attributed to COVID-19 disease. Federal facilities are not immune. The numbers are likely higher, as testing is limited. See, e.g., *In the Matter of the Extradition of Manrique*, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020) (expressing concern about the infection rate within BOP facilities given that "people are not being tested").

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19. Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons. Inmates share small cells, eat together and use the same bathrooms and sinks. . . . . They are not given tissues or sufficient hygiene supplies"); Joseph A. Bick (2007). *Infection Control in Jails and Prisons*. Clinical Infectious Diseases

11

45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"). BOP employees are complaining that they lack masks and gloves, hand sanitizer, and even soap.

"The [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . . We don't know who's infected." *Manrique*, 2020 WL 1307109, at *1.10

Indeed, as the Second Circuit recently observed, present information about the COVID-19 epidemic and the BOPs' prior failings in 2019 to adequately protect detainees and allow them access to counsel and their families following a fire and power outages suggest that the virus' impact will likely be "grave and enduring." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

> 2. <u>Downsbrough's Vulnerability to COVID-19 Due to His High Medical Risk Is an Extraordinary and Compelling Reason That Warrants a Sentence Reduction.</u>

12

Downsbrough is particularly vulnerable to COVID-19 because of his advanced age (67). At the time of sentencing, the Court could not have anticipated that Downsbrough's elderliness will place him in the "high risk" category nor the existence of the COVID-19. As the COVID-19 pandemic continues, it potentially poses a particular issue for older people and people with pre-existing medical conditions (such as diabetes, heart disease, lung disease, and autoimmune disease) appear to be more vulnerable to becoming severely ill with the COVID-19 virus.

Hence, it is appropriate for Downsbrough to be released into an environment where he can control and direct his medical care. It is important for all of us to remember that convicted criminals are sent to prison as punishment—not for punishment. People who are severely debilitated or are in the midst of dying are usually no longer a threat to society, and there is not a compelling social advantage to keeping them in prison.

**Note:**   According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 is a new disease and there is limited information regarding risk factors for severe disease. Based on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19.

a.   Based on what we know now, those at high-risk for severe illness from COVID-19 are:

- People 60 years and older
- People who live in a nursing home or long-term care facility

13

    b.    People of all ages with underlying medical conditions, particularly if not well controlled, including:

- People with chronic lung disease or moderate to severe asthma
- People who have serious heart conditions
- People who are immunocompromised
- Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications
- People with severe obesity (body mass index [BMI] of 40 or higher)
- People with diabetes
- People with chronic kidney disease undergoing dialysis
- People with liver disease

are the hallmark of those who are most endangered by the instant pandemic. These are "extraordinary and compelling reasons" for his release. See Note 1(A), § 1B1.13 (expressly recognizing that "other reasons" may exist for granting compassionate release), see Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Here, Downsbrough's high susceptibility to COVID-19 falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there. Rather, district courts have the freedom to shape the contours of what

14

constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the inability in a facility like FCI to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that Downsbrough falls in the elderly population that has already been identified as "high risk," this Court should find that Downsbrough's legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

A recent letter by fourteen U.S. senators of both parties underscores this position. Writing to U.S. Attorney General William Barr and BOP Director Michael Carvajal, they stated: "[We] urge you to take necessary steps to protect [inmates in Federal custody] particularly by using existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable inmates are released or transferred to home confinement, if possible." And as the Second Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent emergency on jail and prison inmates, their counsel . . . , the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present

15

information strongly suggests, however, that it may be grave and enduring." *Fed. Defs. of New York, Inc.*, 2020 WL 1320886, at *12.

Finally, in the last few days, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the incarcerated population and thus reduce the risk of spread. For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers Island. Approximately 1,700 inmates have been released from Los Angeles County Jails, and 1,000 inmates are to be released from New Jersey jails. Therefore, while COVID-19 remains an unprecedented emergency, many states (and politicians) have recognized that they have a duty to flatten the curve inside incarcerated spaces. So, too, should this Court.

3. Courts Have Granted Compassionate Release in Light of the Instant Pandemic.

Courts in the Southern and Eastern Districts of New York have granted compassionate release based on COVID-19. See *United States v. Wilson Perez*, No. 17 Cr. 513 (AT) (S.D.N.Y. Apr. 1, 2020), ECF No. 98, (granting release based on health issues and finding court could waive exhaustion requirement; government did not object based on defendant's medical conditions); *United States v. Mark Resnick*,

16

No. 12 Cr. 152 (CM) (S.D.N.Y. April 2, 2020), ECF No. 461 (granting compassionate release because of defendant's age and medical conditions in light of COVID-19); *United States v. Eli Dana*, No. 14 Cr. 405 (JMF) (S.D.N.Y. Mar. 31, 2020), ECF No. 108 (granting compassionate release motion, where government consented, because of defendant's age and medical conditions and the risk posed by COVID-19); *United States v. Damian Campagna*, No. 16 Cr. 78 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020) (granting compassionate release sentencing reduction to defendant convicted of firearms offenses based on defendant's health and threat he faced from COVID-19; government consented to reduction and agreed health issues and COVID-19 were basis for relief); *United States v. Daniel Hernandez*, No. 18 Cr. 834 (PAE) (S.D.N.Y. Apr. 1, 2020), ECF No. 446 (granting compassionate release after BOP denied the request and converting remaining sentence to home confinement); *United States v. Jose Maria Marin*, No. 15 Cr. 252 (PKC) (E.D.N.Y. Mar. 30, 2020), ECF No. 1325-1326 (waiving exhaustion requirement and granting compassionate release to defendant based on special risks he faced from COVID-19).

So, too, have courts across the country. See *United States v. Andre Williams*, No. 04 Cr. 95 (MCR) (N.D. Fla. Apr. 1, 2020) (granting release based on defendant's health and COVID-19); *United States v. Teresa Ann Gonzalez*, No. 18 Cr. 232 (TOR) (E.D. Wa. Mar. 25, 2020), ECF No. 834 (waiving any further exhaustion attempts as

17

futile and granting compassionate release based on defendant's health issues and COVID-19 pandemic); *United States v. Jeremy Rodriguez*, No. 03 Cr. 271 (AB) (E.D. Pa. Apr. 1, 2020), ECF No. 135 (finding court has independent authority to determine "extraordinary and compelling" reasons and granting compassionate release based in part on defendant's health and COVID-19; no exhaustion issue because 30 days had passed); *United States v. Pedro Muniz*, No. 09 Cr. 199 (S.D. Tex. Mar. 30, 2020), ECF No. 578 (granting compassionate release based on health conditions that made inmate susceptible to COVID-19); *United States v. Samuel H. Powell*, No. 94 Cr. 316 (ESH) (D.D.C. Mar. 27, 2020), ECF No. 97 (granting compassionate release for 55-year old defendant with respiratory problems in light of outbreak, without waiting for 30 days or other exhaustion of administrative remedies through the BOP); *United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT) (D. Mass. Mar. 17, 2020), ECF No. 642 (granting defendant's emergency motion based on COVID-19); *United States v. Coker*, No. 3:14-CR-085-RLJ-DCP-20, 2020 WL 1877800 (E.D. Tenn. Apr. 15, 2020) (Memorandum Opinion, granting compassionate release based in part on COVID-19); *Samy v. United States*, No. 2:16-cr-20610-1, 2020 WL 1888842 (E.D. Mich Apr. 16, 2020) (Order granting petitioner's motion for reconsideration of order denying compassionate release based in part on COVID-19).

18

See also *United States v. Fischman*, Case No. 16-cr-00246-HSG-1 (N.D. Cal. May. 1, 2020) (granting motion for compassionate release for defendant convicted of possession of child pornography where defendant had served majority of his sentence and taken steps towards rehabilitation while in prison). In concluding that compassionate release is warranted, the Court also considers whether Fischman poses a danger to the safety of the community, as well as the factors set forth in § 3553(a). Fischman's offense, though very serious, was his first. During his time in federal custody, he has taken steps to rehabilitate himself, including through successful completion of the RDAP treatment program. He also teaches classes, leads reading groups, and leads religious services. See Dkt. No. 47 at 18. In short, the Court finds that Fischman is a **non-violent offender** who has served the majority of his sentence and whose early release **will not endanger the community**. See U.S. Sentencing Guidelines, § 1B1.13(2). Congress has entrusted the courts with imposing sentences "sufficient but not greater than necessary." See 18 U.S.C. § 3553(a). The Court finds that the risk to Fischman's health were he required to stay at FCI Terminal Island to complete the final months of his sentence would be greater than necessary and not commensurate with the "just punishment for [his] offense." See *id*. Hence, Downsbrough should be granted the same relief.

19

## B. Elderly Offender Home Detention ("EOHD")

Back in 2009, the Second Chance Act of 2007 authorized the BOP to run a two-year pilot program to permit non-violent elderly offenders (65 years and older) to go to home confinement for the remainder of their sentences if they had been down 10 years and done 75% of their sentences. The program was tested at only one facility (FCI Elkton) for a two-year period.

It did not work that well, because the combination 10-year minimum and 75% seemed to eliminate just about everyone who otherwise would otherwise had been eligible.

### First Step Act of 2018

The First Step Act has now re-established the program, calling it the Elderly Offender Home Detention program. The new EOHD would apply at every BOP facility – not just one – and be extended to all nonviolent elderly offenders who had completed 66.67% (no longer 75%) of their sentences. The 10-year minimum service of sentence was eliminated.

Under the program, an eligible inmate could go to home confinement at 66.67% of the whole sentence, and be released from home confinement to supervised release at 85% of his or her sentence.

20

*EOHD Requirements*

Most of the requirements have not changed from the pilot program, refer to 34

U.S.C. § 60541(g), which reads:

### 34 U.S. Code § 60541. Federal prisoner reentry initiative

(g)     Elderly and family reunification for certain nonviolent offenders pilot
program

      **(1)     Program authorized**
      **(A)     In general**
      The Attorney General shall conduct a pilot program to determine
the effectiveness of removing eligible elderly offenders from a
Bureau of Prisons facility and placing such offenders on home
detention until the expiration of the prison term to which the
offender was sentenced.

      **(B)     Placement in home detention**
      In carrying out a pilot program as described in subparagraph (A),
the Attorney General may release some or all eligible elderly
offenders from the Bureau of Prisons facility to home detention.

      **(C)     Waiver**
      The Attorney General is authorized to waive the requirements of
section 3624 of title 18 as necessary to provide for the release of
some or all eligible elderly offenders from the Bureau of Prisons
facility to home detention for the purposes of the pilot program
under this subsection.

      **(2)     Violation of terms of home detention**
A violation by an eligible elderly offender of the terms of home
detention (including the commission of another Federal, State, or local
crime) shall result in the removal of that offender from home detention
and the return of that offender to the designated Bureau of Prisons
institution in which that offender was imprisoned immediately before

21

placement on home detention under paragraph (1), or to another appropriate Bureau of Prisons institution, as determined by the Bureau of Prisons.

**(3)    Scope of pilot program**
A pilot program under paragraph (1) shall be conducted through at least one Bureau of Prisons facility designated by the Attorney General as appropriate for the pilot program and shall be carried out during fiscal years 2009 and 2010.

**(4)    Implementation and evaluation**
The Attorney General shall monitor and evaluate each eligible elderly offender placed on home detention under this section, and shall report to Congress concerning the experience with the program at the end of the period described in paragraph (3). The Administrative Office of the United States Courts and the United States probation offices shall provide such assistance and carry out such functions as the Attorney General may request in monitoring, supervising, providing services to, and evaluating eligible elderly offenders released to home detention under this section.

See 34 U.S.C. § 60541(g)(1)-(4).

Among other requirements, the eligible offender has to be 60 years old or older, cannot ever have been convicted of a crime of violence, have served 66.67% of "the term of imprisonment to which the offender was sentenced," have never tried to escape, whose home detention will save the BOP money, and who the BOP determines "to be at no substantial risk of engaging in criminal conduct or of endangering any person or the public if released to home detention."

22

*Eligibility*

Downsbrough is now 67 and has served 90 months (74%) of his 121 month sentence, not the sentence minus good-time, or minus earned time credits. Further, Downsbrough was never convicted of a crime of violence, nor did he ever try to escape. It is essential to also note that since Downsbrough's incarceration began, he has taken numerous steps to attempt to improve himself in "post-conviction rehabilitation." Finally, Downsbrough is not a danger or threat to any person or the community.

## C.     **THE CARES ACT**

On March 13, 2020, President Donald Trump declared a state of emergency due to the novel COVID-19 outbreak. On March 25, the U.S. Senate passed the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act) to provide emergency assistance to people affected by the outbreak.

The CARES Act reflects our country's immense concern for people who have been and will be harmed by the pandemic, including people incarcerated in the Federal Bureau of Prisons (BOP). Section 12003(b)(2) of the CARES Act permits the Director of the BOP to lengthen the maximum amount of time that a prisoner may be placed in home confinement, if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP.

23

Previous law dictated that the Director of the BOP had authority to place a prisoner in home confinement for the shorter of 10 percent of a person's term of imprisonment or 6 months, but the CARES Act greatly expands that authority to allow prisoners to be transferred to home confinement earlier in their sentence. Under the CARES Act, the Director may lengthen the maximum term of home confinement to whatever he determines appropriate during the pandemic. Given the current state of emergency, we urge you to use the CARES Act to quickly transfer prisoners who are at high risk for complications from COVID-19 to home confinement.

COVID-19 is an unprecedented crisis, with widespread harm. The CDC has issued guidance that people over 60 years old and individuals with chronic medical conditions are at a higher risk of contracting COVID-19 and of experiencing more serious complications or death as a result of the illness. The CDC has also advised these individuals to avoid crowds, stay at home as much as possible. Similarly, the CDC has advised that all people practice heightened levels of hygiene and "social distancing," limiting close contact with others as much as possible. People in BOP custody are unable to take any such proactive steps to protect themselves. Indeed, conditions of confinement and the needs of security are often in direct contrast with best practices for limiting contagion and promoting public health during a pandemic.

24

It is indisputable that COVID-19 and related emergency conditions materially affect the functioning of the BOP. The BOP has suspended visitation and imposed a 14-day quarantine on new transfers. Programming and meal schedules have been dramatically altered.

Of special concern is the fact that many facilities utilize close quarter housing and are unable to adequately distance prisoners, all but guaranteeing a rapid spread of the virus once it takes hold in a facility. That COVID-19 will further materially alter BOP's functioning in the weeks and months to come is assured. The spread of the virus within BOP facilities puts prison staff at high risk of contracting the disease at their workplace. Staffing shortages, including of health care workers, are bound to occur as personnel fall ill and self isolate. The BOP's medical facilities are not staffed or equipped to deal with high numbers of seriously ill people who will need critical care that could last for weeks, as serious cases of COVID-19 do.

Meanwhile, many individuals under BOP custody who are nearing release have already been transferred to residential reentry centers (RRCs). Unfortunately, conditions at RRCs have also been greatly impacted by COVID-19. Movement has been restricted, employment opportunities have halted, people are confined in tight quarters and don't have the resources to comply with CDC guidance addressing their hygiene or freedom to practice social distancing. Individuals in home confinement

25

would be far better equipped to prevent the spread of COVID-19, and they would be a far lower risk to the BOP or the public's health care system.

Here, although those factors fully support the substantial sentence originally imposed, in the current context of Downsbrough's advanced age amidst the COVID-19 pandemic, Downsbrough's family believes compassionate release is appropriate at this time.

Downsbrough is a non-violent offender, hence, his recidivism is especially low. Based on his declining years and the world's take on the global pandemic right now, and good time credits he has served, Downsbrough have met all the requirements for compassionate release.

If granted compassionate release, Downsbrough will reside in his home in Breckenridge, Colorado– where he will be able to isolate himself and take the same precautionary measures that all Americans are taking: frequent hand washing, sanitizing his living space, and seeking medical care if necessary. None of these precautions are available in prison. Further information about these release plans upon request.

## IV. <u>CONCLUSION</u>

For the above and foregoing reasons, Downsbrough prays this Court would consider his Motion for Compassionate Release pursuant to 18 U.S.C. §

26

3582(c)(1)(A), CARES Act, and the First Step Act of 2018, based upon the "extraordinary and compelling reasons" and release him to home confinement or hold a hearing as soon as possible.

Respectfully submitted,

Dated: December _1_, 2020.

_____
BRUCE OWEN DOWNSBROUGH
REG. NO. 46127-074
FCI ENGLEWOOD
FEDERAL CORR. INSTITUTION
9595 WEST QUINCY AVENUE
LITTLETON, CO  80123
Appearing *Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that on December _1_, 2020, I mailed a true and correct copy of the above and foregoing Motion for Compassionate Release/Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A), CARES Act, and the First Step Act of 2018 via U.S. Mail, postage prepaid, to Matthew T. Morris, Assistant U. S. Attorney at United States Attorney's Office, 800 Market Street, Suite 211, Knoxville, TN 37902.

_____
BRUCE OWEN DOWNSBROUGH

27

**EXHIBIT 1:**
**"Individualized Reentry Plan – Program Review"**


| | | |
|---|---|---|
| Facility: | **BIG BIG SPRING FCI** | Proj. Rel. Date: 12-31-2021 |
| Name: | **DOWNSBROUGH, BRUCE OWEN** | Proj. Rel. Mthd: GCT REL |
| Register No.: | **46127-074** | DNA Status: BIG05300 / 09-15-2014 |
| Age: | 66 | |
| Date of Birth: | 05-05-1953 | |

## Detainers

| Detaining Agency | Remarks |
|---|---|

*NO DETAINER*

## Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| BIG | EDUC TUT | EDUCATION | 10-31-2019 |

## Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| BIG | ESL HAS | ENGLISH PROFICIENT | 08-11-2014 |
| BIG | GED HAS | COMPLETED GED OR HS DIPLOMA | 08-11-2014 |

## Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| BIG | C | 2ND SECTION BASIC COMPUTER PM | 01-15-2019 | 09-10-2019 |
| BIG | C | ACE FROM POLITICS TO POWER | 10-25-2018 | 01-17-2019 |
| BIG | C | TUTOR TRAINING CLASS | 06-12-2017 | 06-12-2017 |
| BIG | C | TUTOR TRAINING CLASS | 07-20-2018 | 07-20-2018 |
| BIG | C | 2ND SECTION BASIC COMPUTER PM | 08-29-2017 | 03-01-2018 |
| BIG | C | 1ST SECTION BASIC COMPUTER PM | 03-02-2017 | 08-29-2017 |
| BIG | C | 3 HR TRAINING REC AIDE | 04-08-2017 | 04-12-2017 |
| BIG | C | ACE UNDERSTANDING MEDICARE | 08-19-2016 | 09-20-2016 |
| BIG | C | TUTOR TRAINING CLASS | 11-03-2016 | 11-03-2016 |
| BIG | C | ACE BEGINNER SPANISH | 03-18-2016 | 06-10-2016 |
| BIG | C | ACE PHOTOGRAPHY | 02-24-2016 | 04-08-2016 |
| BIG | C | NUTRIONAL & EXERCISE NEEDS | 12-07-2015 | 12-28-2015 |
| BIG | C | ACE INVESTING 1 | 10-05-2015 | 11-23-2015 |
| BIG | C | TUTOR TRAINING CLASS | 08-13-2015 | 08-13-2015 |
| BIG | C | LEAP COMMITTMENT TO CHANGE SR | 04-21-2015 | 06-29-2015 |
| BIG | C | MONEY SMART RPP TUE&THU 0800 | 03-12-2015 | 05-01-2015 |
| BIG | C | TUTOR TRAINING CLASS | 08-13-2014 | 08-13-2014 |

## Discipline History (Last 6 months)

| Hearing Date | Prohibited Acts |
|---|---|

*\*\* NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS \*\**

## Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1-MH | CARE1-MENTAL HEALTH | 07-29-2014 |
| CARE2 | STABLE, CHRONIC CARE | 07-17-2014 |

## Current Medical Duty Status Assignments

| Assignment | Description | Start |
|---|---|---|
| NO PAPER | NO PAPER MEDICAL RECORD | 07-21-2014 |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 07-21-2014 |
| YES F/S | CLEARED FOR FOOD SERVICE | 07-21-2014 |

## Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| ED NONE | DRUG EDUCATION NONE | 08-06-2014 |

## FRP Details

Case 3:13-cr-00061-TAV-DCP  Document 57  Filed 12/07/20  Page 30 of 35  PageID #: 356



# Individualized Reentry Plan - Program Review  (Inmate Copy)

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: DOWNSBROUGH, BRUCE OWEN  46127-074

| Most Recent Payment Plan |
|---|

*** NO FRP DETAILS ***

**FRP Assignment:**     **COMPLT**     **FINANC RESP-COMPLETED**        **Start: 08-14-2014**

Payments past 6 months:          **$0.00**                    Obligation Balance: **$0.00**

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 2 | ASSMT | $200.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |
| 3 | REST FV | $25,000.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |
| 1 | FINE | $75,000.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |

**Payment Details**

Trust Fund Deposits - Past 6 months:   $0.00                         Payments commensurate ?   N/A

New Payment Plan:        | ** No data ** |

## Progress since last review

| Downsbrough completed one class since his last team meeting.  Will continue to encourage participation in recommended classes. |
|---|

## Next Program Review Goals

| No progress noted. Enroll and participate in Healthy Living class by August 2020. Complete by February 2020. Enroll in class through Recreation. |
|---|

## Long Term Goals

| No progress noted. Obtain a driver license, social security card, and photo identification by April 2021. |
|---|

## RRC/HC Placement

| No.<br>Management decision - Will review 17-19 months prior to release.. |
|---|

## Comments

| ** No notes entered ** |
|---|

**EXHIBIT 2:**
**"Motion for Compassionate Release Denied on October 5, 2020"**

DOWNSBROUGH, Bruce
Reg. No. 46127-074
Upper WEST

INMATE REQUEST TO STAFF MEMBER

You requested a Compassionate Release based on concerns about COVID-19. After careful consideration, your request is denied.

Title 18 of the United States Code, section 3582(c)(1)(A), allows a sentencing court, on motion of the Director of the BOP, to reduce a term of imprisonment for extraordinary or compelling reasons. BOP Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), provides guidance on the types of circumstances that present extraordinary or compelling reasons, such as the inmate's terminal medical condition, debilitated medical condition, status as a "new law" elderly inmate, an elderly inmate with medical conditions, or an "other elderly inmate", the death or incapacitation of the family member caregiver of the inmate's child, or the incapacitation of the inmate's spouse or registered partner.

Your request has been evaluated consistent with this general guidance regarding your specific request due to COVID-19. Your request does not meet the requirements for eligibility of Compassionate Release. There is no supporting documentation or verification submitted with your request. You state no other concerns other than your age. Future medical diagnosis and treatment are readily available to incarcerated persons by Bureau of Prisons medical staff and outside medical providers. Outside medical appointments are scheduled as soon as practicable for patient's needs and outside medical provider's availability. Programming while incarcerated is expected and does not warrant special consideration for early release under this policy.

The BOP is taking extraordinary measures to contain the spread of COVID-19 and treat any affected inmates. We recognize that you, like all of us, have legitimate concerns and fears about the spread and effects of the virus. However, your concern about being potentially exposed to, or possibly contracting, COVID-19

does not currently warrant an early release from your sentence. Accordingly, your Compassionate Release request is denied at this time.

If you are not satisfied with this response to your request, you may commence an appeal of this decision via the administrative remedy process by submitting your concerns on the appropriate form (BP-9) within 20 days of the receipt of this response.


for S. Collins
B. Greilick, Warden

10/5/2020
Date



UNIT...
POST...

**PRIORITY MAIL 2-DAY®**

0 Lb 6.90 Oz

1006

EXPECTED DELIVERY DAY: 12/07/20

C002

SHIP
TO:
800 MARKET ST
STE 130
Knoxville TN 37902-2303

**USPS TRACKING® NUMBER**



9505 5104 4804 0338 5145 13

■ Expected delivery d...
■ Most domestic ship...  ...ply).*
■ USPS Tracking® inc...  ...ns.
■ Limited internationa...
■ When used internat...

*Insurance does not cover
Domestic Mail Manual at h...
** See International Mail M...  ...age.

**FLAT RAT...**
ONE RATE ■ ANY WEIGHT

**TRACKED ■ INSURED**



PS00001000014

EP14F May 2020
OD: 12 1/2 x 9 1/2

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

FROM:

MR. BRUCE OWEN DOWNSBROUGH
REG. NO. 46127-074
FCI ENGLEWOOD
FEDERAL CORR. INSTITUTION
9595 WEST QUINCY AVENUE
LITTLETON, CO 80123

TO:

Mr. John L. Medearis
Clerk of Court
U. S. District Court
Eastern District of Tennessee
Knoxville Division
800 Market Street, Suite 130
Knoxville, TN 37902

RECEIVED

DEC 0 7 2020

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville